UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION


United States of America,      )
                               )
                Plaintiff,     )
                               )
        vs.                    )      File No. 3:08-mj-107
                               )               3:08-cr-106-6
Sean Anthony Ogle,             )
                               )
                Defendant.     )



TRANSCRIPT OF
VIDEOCONFERENCE PROCEEDING




Taken at
United States Courthouse
Bismarck, North Dakota
October 21 and 22, 2008




BEFORE THE HONORABLE CHARLES S. MILLER, JR.
-- UNITED STATES DISTRICT COURT MAGISTRATE JUDGE --

APPEARANCES

MR. BRETT M. SHASKY (by videoconference from Fargo)
U.S. Attorney's Office
Quentin N. Burdick U.S. Courthouse
655 First Avenue North, Suite 250
Fargo, North Dakota 58102-4932

FOR THE UNITED STATES

- - - - - - - - - -

MR. JOHN T. GOFF (by videoconference from Fargo)
Montgomery, Goff & Bullis
4650 38th Avenue South, Suite 110
P.O. Box 9199
Fargo, North Dakota 58106-9119

FOR THE DEFENDANT

- - - - - - - - - -

1    (The above-entitled matter came before the Court, The

2  Honorable Charles S. Miller, Jr., United States District Court

3  Magistrate Judge, presiding, commencing at 3:33 p.m., Tuesday,

4  October 21, 2008, in the United States Courthouse, Bismarck,

5  North Dakota; counsel appearing on behalf of the respective

6  parties as hereinbefore indicated:)

7    (The following proceedings were had and made of

8  record by videoconference from Bismarck to Fargo:)

9    THE COURT:  We'll go on the record in Magistrate's

03:33  10  Number 3-08-107, *United States of America versus Sean Anthony*

11  *Ogle*.  We're proceeding today by videoconference.  Present in

12  Bismarck is the Court and Court staff.  Would the parties in

13  Fargo please note their appearances for the record?

14    MR. SHASKY:  Your Honor, Assistant U.S. Attorney

03:34  15  Brett Shasky on behalf of the United States.

16    MR. GOFF:  John Goff, Your Honor, Montgomery Goff &

17  Bullis of Fargo for the defendant, Sean Ogle, who is seated

18  directly to my right.

19    THE COURT:  Mr. Goff, have you been appointed yet?

03:34  20    MR. GOFF:  I was contacted by the clerk's office

21  yesterday on a CJA appointment and asked if I would accept it,

22  and I said that I would.  That's all I've -- but I haven't seen

23  any paperwork.

24    THE COURT:  Okay.

03:34  25    MR. GOFF:  With the exception of the Complaint and

3

1    the Affidavit in support, I've seen that.

2           THE COURT:  Right.  Okay.  Mr. Ogle, are you

3    requesting that the Court appoint an attorney to represent you

4    for the proceedings in this district?

03:34    5           THE DEFENDANT:  I am, yes.

6           THE COURT:  I want to ask you some questions about

7    your financial qualifications.  Do you have a checking account

8    or a savings account?

9           THE DEFENDANT:  I don't.

03:35    10          THE COURT:  How much -- could you pull the microphone

11   up to you, please?  How much cash do you have available to you

12   today, not present in Fargo, but available to you?

13          THE DEFENDANT:  None.

14          THE COURT:  I see that you own a residence, is that

03:35    15   correct?

16          THE DEFENDANT:  Yes, me and my mother own it.

17          THE COURT:  Based on those responses and the other

18   information that's contained in the Pretrial Services Report

19   from the District of Minnesota, I find that you're entitled to

03:36    20   court-appointed counsel, and I'm going to appoint Mr. Goff to

21   be your attorney.

22          Let's proceed then to the issue of the preliminary

23   hearing.  Are the parties ready to proceed on the preliminary

24   hearing?

03:36    25          MR. SHASKY:  Yes, Your Honor.

4

1          MR. GOFF:  Yes, Your Honor, ready to proceed on the

2     preliminary hearing.  There is one procedural matter, though,

3     that I would like to put on the record at the outset --

4          THE COURT:  Okay.

03:36     5          MR. GOFF:  -- regarding the preliminary.

6          THE COURT:  Go ahead.

7          MR. GOFF:  Thank you.  My review of the

8     documentation, the docket sheet entries from the District of

9     Minnesota indicate that my client's initial appearance before

03:36    10     Magistrate Judge Franklin L. Noel of the District of Minnesota

11     was on October 3, 2008, on the charges from the District of

12     North Dakota.  They then conducted a detention hearing and

13     removal hearing on October 6, 2008, before Magistrate Judge

14     Jeffrey J. Keyes, also in the District of Minnesota, and he was

03:37    15     ordered committed to this district to face charges here.

16          So it seemed to me that the initial appearance was on

17     October 3rd, and at the very latest the detention hearing was

18     on October 6th.  And the preliminary hearing, since he is in

19     custody and has been in custody continuously since that time,

03:37    20     is required pursuant to Rule 5.1 to be conducted within ten

21     days after his initial appearance if he's in custody, which he

22     is.  And we are now at October 21st, which is certainly outside

23     that ten-day limit, and so I think that that rule itself has

24     been violated.

03:38    25          There is a provision for extending the time, which

1  talks both in terms of the defendant's consent, which he has
2  not given at all to the best of my knowledge, certainly not
3  since I've talked with him today, or otherwise the magistrate
4  judge may extend time limits only on a showing that
5  extraordinary circumstances exist and justice requires the
6  delay.  I don't think, to the best of my knowledge, that has
7  happened.  And we are, I would say, roughly five days -- at
8  least five days, maybe as many as eight days beyond the ten-day
9  limit.

10          THE COURT:  Mr. Shasky?

11          MR. SHASKY:  Your Honor, I think clearly from the
12  date of his initial appearance in the District of Minnesota, we
13  are beyond the ten days.  However, and I'm not sure -- I just
14  found out at about 11:30 this morning that he was even in the
15  District of North Dakota, and I have not been able to check to
16  see when he was actually brought into our district.  I don't
17  know what the reason for the delay in scheduling this was.
18  Obviously that is something that's done by the Court, and I
19  don't know what happened in that regard.

20          The rule isn't clear either, Judge, as far as if
21  having made his initial appearance in a different district and
22  having a preliminary hearing here in our district, where he's
23  been charged, if that kind of tolls that ten-day period.  It's
24  just not clear under Rule 5.1 if that's intended or not.

25          MR. GOFF:  Your Honor, 5.1(b) does refer to selecting

6

1   a district, and it says the defendant arrested in a district

2   other than where the offense was allegedly committed may elect

3   to have the preliminary hearing -- may elect to have the

4   preliminary hearing conducted in the district where the

5   prosecution is pending.  I don't know if he was ever asked for

6   an election, but the subsequent -- or the following subdivision

7   which I referred to earlier that said the ten-day limit, it

8   just says the magistrate judge must hold the preliminary

9   hearing within a reasonable time, but no later than ten days

10  after the initial appearance if he's in custody.  So it does

11  talk about different districts, but doesn't say anything about

12  tolling the time limit or extending it.

13          MR. SHASKY:  Your Honor, I did have a chance just now

14  to ask one of our deputy U.S. marshals as to when this

15  defendant was brought to our district.  And I'm advised that he

16  was brought into our district from the District of Minnesota on

17  October 15th, so he's been here for six days.

18          MR. GOFF:  Again, Your Honor, there's nothing in the

19  rule to talk about tolling on those basis -- on that basis.

20          THE COURT:  I'm looking at the documentation that

21  I've been provided from the District of Minnesota, and I don't

22  see anything specifically that indicates that the defendant

23  requested a preliminary hearing in this district one way or the

24  other.

25          MR. GOFF:  Your Honor, John Goff.  I agree.  From

7

1   what I've seen in the docket text, that doesn't -- isn't

2   included.  However, I would just state that that provision,

3   5.1, Sub (b) is a permissive election.  It says may elect.

4           THE COURT:  Right.

03:44  5           MR. GOFF:  And 5.1, Sub (c), of the scheduling is

6   mandatory.  The Court must hold a preliminary within ten days

7   in either district, it would appear to me.  It doesn't provide

8   for a remedy that I can see in the rule, nor have I seen one in

9   my review of the advisory committee notes.  So it would be my

03:44  10  request that if the Court does find that I'm correct in my

11  assessment that there's been a violation of that time limit,

12  then I would ask that the Complaint be dismissed.

13          THE COURT:  Well, the defendant was seen at his

14  initial appearance on October 3rd, and then his removal and

03:45  15  detention hearing was on the 6th.  And so sometime between the

16  6th and the 15th he was -- the transport process started.  And

17  assuming the proffer is correct, he did not reach this district

18  until the 15th, and I don't know how long that process took.  I

19  don't know whether he was transported, for example, on the 14th

03:46  20  and arrived on the 15th or whether they started the

21  transportation process on the 7th and he arrived here on the

22  15th.

23          MR. GOFF:  According to the text in the docket, Your

24  Honor, the commitment to another district, committing him to

03:46  25  the District of North Dakota, was signed by a magistrate.  It

8

1    appears to be October 10th it was signed.  Now, after that, I

2    don't know.

3              THE COURT:  Okay.

4              MR. SHASKY:  Your Honor, as I'm looking at what

5    Mr. Goff, I think, was just mentioning, the commitment to

6    another district form that was certified on the 10th, I believe

7    that is something that was received by our marshals on the

8    11th, and that's -- it took them four days, basically, to get

9    somebody down there and get him back to North Dakota.  So as of

10   the 11th is the first date we're made aware that they should go

11   and get him even.

12             THE COURT:  But by the 11th we were two days short of

13   the deadline for the preliminary hearing.

14             MR. GOFF:  That sounds to be correct, Your Honor.  I

15   don't dispute the facts that Mr. Shasky is relating through the

16   marshal service.  I don't dispute those at all.  I just think

17   that the rule is mandatory, and the time has expired by a

18   number of days.

19             THE COURT:  Well, Mr. Shasky, what I'm going to do

20   today is that I'm going to take any testimony that you want to

21   present, and I'm going to require you to submit a brief by noon

22   tomorrow outlining why I should not dismiss the Complaint.

23             MR. SHASKY:  That's fine, Your Honor.

24             THE COURT:  And I'm going to continue the hearing

25   until -- what's your schedule tomorrow, Mr. Goff?

9

1          MR. GOFF:  Your Honor, tomorrow I have to be in

2     Crookston, Minnesota, for a hearing at 11 o'clock in the

3     morning, so I anticipate I'll be leaving by about -- at least

4     by 9:30.  And if everything goes as planned, I'll be out of

03:48   5     Crookston by noon and back here by about 1:30.

6          THE COURT:  I've got another matter that I've got, I

7     think, scheduled from Fargo by video at 1 o'clock tomorrow.

8     Would it be possible for you to come back to the courthouse

9     when you get done in Crookston, whenever that may be, Mr. Goff?

03:48   10          MR. GOFF:  Yes, that's fine.

11          THE COURT:  I'm going to continue the hearing then

12     until tomorrow to address your objection.  But I'm going to

13     tell you, Mr. Shasky, my understanding of the rules is that the

14     United States has ten days to -- I mean, there's ten days to

03:49   15     hold the preliminary hearing, and the defendant has to waive

16     the ten days or request that the hearing be held in the

17     district of where the charge originates out of.  And absent one

18     of those two things, then I think it was incumbent upon the

19     system, whether it be the United States or the court system, to

03:49   20     hold the preliminary hearing within ten days of the date that

21     he first appeared before the magistrate in Minnesota.

22          Now, I can be convinced otherwise.  You can also make

23     your other -- whatever argument you wish to make on Rule 5.1

24     that there's some exceptional circumstances that should apply

03:50   25     here, but I'm not clear as to what that would be, so you need

10

1    to convince me by noon tomorrow.

2            MR. SHASKY:  All right.

3            THE COURT:  You can fax -- you can file the brief by

4    CM/ECF, and I'll look on my computer at noon tomorrow.

03:50    5            MR. SHASKY:  I'll do that, Your Honor.

6            THE COURT:  Mr. Goff, is there any objection to my

7    considering this matter by videoconference?

8            MR. GOFF:  No, we have no objection to that, Your

9    Honor.  We requested that it be had as soon as possible.

03:50   10            THE COURT:  You may proceed to call whatever witness

11   you want to call, Mr. Goff -- I mean Mr. Shasky.  Sorry.

12            MR. SHASKY:  Thank you, Your Honor.  Your Honor, I do

13   have one witness.  That is Detective Charles Anderson.  He's

14   with the DEA Task Force.  I'm not sure where you want to have

03:51   15   him sit so you can see him.

16            THE COURT:  You can have him sit right between you

17   and Mr. Goff, is fine.  Would the witness please stand and

18   raise your right hand, please.

19                              CHARLES ANDERSON,

03:51   20   having been first duly sworn, was examined and testified as

21   follows:

22            MR. SHASKY:  Your Honor, if I could inquire, I know

23   this is from the east side of the state on this case, so I

24   don't know if you've had an opportunity to go through the

03:51   25   Affidavit that came with the Complaint.

11

1    THE COURT:  I have.

2    MR. SHASKY:  Okay.  Detective Anderson is the affiant

3  on that Complaint as well, so I'm going to try and shorten

4  things up a little bit if I can because of that.

03:51    5                    DIRECT EXAMINATION

6  BY MR. SHASKY:

7  Q.   Could you please state your name?

8  A.   Charles Anderson.

9  Q.   And where are you employed?

03:52   10  A.   Clay County Sheriff's Office, Moorhead, Minnesota.

11  Q.   And are you also on the DEA Drug Task Force here?

12  A.   Yes, that's correct.

13  Q.   And your area of responsibility is what?

14  A.   Narcotics enforcement both at the state level and the

03:52   15  federal level.

16  Q.   And with regard to those duties, Detective Anderson, did

17  you become involved with an investigation of a drug conspiracy

18  that involved Sean Anthony Ogle?

19  A.   Yes, I did.

03:52   20  Q.   And through the course of your investigation, did you

21  become familiar with information concerning his involvement?

22  A.   Yes, I did.

23  Q.   And did you put that information together in the form of

24  an affidavit in this case?

03:52   25  A.   Yes, that's correct.

12

1   **Q.**   And did you also present that affidavit to Magistrate

2   Judge Klein here in Fargo on October 2nd, along with a Criminal

3   Complaint?

4   **A.**   Yes, I did.

03:53   5   **Q.**   With regard to the information that is contained in

6   Exhibit B, your Affidavit to that Complaint, is everything in

7   that Affidavit true and correct to the best of your knowledge?

8   **A.**   Yes, it is.

9   **Q.**   Is there anything in there that you would wish to change?

03:53   10   **A.**   No.

11         MR. SHASKY:  Your Honor, at this point we would

12   submit the information in the Affidavit that's been filed with

13   the Complaint, and I will ask Detective Anderson some

14   additional questions about some other information on this, if

03:53   15   that's acceptable with the Court to proceed in that fashion.

16         THE COURT:  So you're proffering Exhibit B to the

17   Complaint and asking the Court to accept that as part of the

18   record for the preliminary hearing?

19         MR. SHASKY:  Yes, Your Honor.

03:53   20         THE COURT:  Any objection, Mr. Goff?

21         MR. GOFF:  Well, the witness is here, Your Honor.

22   The affiant is here.  I would prefer that he just provide the

23   testimony directly, so, yes, I would object to it as a hearsay

24   statement when the witness is here to provide that statement.

03:54   25   I know hearsay is admissible, but, I mean, his Affidavit, when

13

1   he's here to testify and present the facts himself, I would

2   think would be a preferable procedure.

3          THE COURT:  Well, I'm going to overrule the

4   objection.  Hearsay is permissible for a preliminary hearing,

03:54   5   and the defendant is available for your examination -- or I

6   mean not the defendant.  I mean Mr. Anderson, the affiant, is

7   available for your examination, but, Mr. Shasky, I think it

8   would be prudent on your part to conduct some further inquiry

9   and just not rest on the Affidavit.

03:54   10          MR. SHASKY:  Your Honor, we have additional

11   information that we will provide.

12   **Q.**  (MR. SHASKY CONTINUING)  Detective Anderson, have you had

13   -- since the time of this Affidavit, have you had additional

14   information come your way with regard to Mr. Ogle's involvement

03:55   15   in this drug conspiracy?

16   **A.**   Yes, I have.

17   **Q.**   Could you tell us what else you've learned?

18   **A.**   Well, in addition to the information that was provided by

19   Jared Nikle, Todd Vise and Paula Harland, we've also

03:55   20   interviewed a lady by the name of Michelle Foss, who was a

21   participant in the case which initially led to Sean Ogle's

22   information being provided.  Michelle Foss was involved with

23   Richard Heyen, who was the subject of a search warrant after a

24   sale of methamphetamine.

03:55   25          Michelle Foss assisted Richard Heyen in the retrieval

1   of additional methamphetamine from his residence and attempted

2   to dispose of it.  The disposal of the methamphetamine led to

3   her arrest after she had delivered the meth. to an individual

4   who was cooperating with the Fargo Police Department.  She has

5   signed an agreement to cooperate and provide that information

6   to myself during an interview, and she indicated that she had

7   knowledge of Mr. Heyen acquiring the methamphetamine and

8   attempted to dispose of it.  She knew of Mr. Heyen's

9   involvement in the sale of methamphetamine and had used

10  methamphetamine with him.

11        She also advised me that she was aware that Christine

12  Artamenko, who is a girlfriend of Todd Vise who was arrested on

13  the same date with Richard Heyen, Christine Artamenko had

14  advised Michelle Foss that she was going to contact Sean Ogle

15  with reference to the arrest of Heyen and Todd Vise.  After

16  Mr. Vise had been arrested, he initially provided a statement

17  and since has agreed to cooperate with the United States

18  Government and has provided additional information, which

19  basically corroborated information provided concerning Sean

20  Ogle and the fact that Ogle was distributing methamphetamine to

21  individuals in the Fargo, North Dakota, area.

22        After -- and in addition to, I've also interviewed a

23  female by the name of Jessica Seeley, who resided with Jay

24  Weist.  Jay Weist was the subject of a search warrant and

25  during the search warrant provided information that he had

15

1   acquired meth. and marijuana from Sean Ogle.  Jessica Seeley

2   stated that she spent a considerable amount of time with Jay

3   Weist during the summer of 2008 and she became aware that Jay

4   Weist was acquiring multiple-ounce quantities of

03:58   5   methamphetamine from Sean Ogle.  She also overheard Jay Weist

6   talk about the methamphetamine coming from a source being in

7   Arizona and the source being referenced to the name of Sean and

8   Candy, Candy being Candice Peterson, who is Sean Ogle's

9   girlfriend.

03:58   10        In addition then, Justin Peterson, who has been

11   indicted in this case and has signed an agreement with the

12   United States Government to cooperate, provided a proffer

13   interview on the 15th of this month.  He identified Candice

14   Peterson by a photograph line-up and also Sean Ogle by a

03:59   15   photograph line-up and stated that they were persons that were

16   involved in the distribution of methamphetamine with Jason Moe,

17   who also has been indicted in this case.  Peterson identified

18   Sean Ogle as being with Jason Moe in Felton, Minnesota, where

19   methamphetamine had been distributed to Justin Peterson this

03:59   20   summer.

21        In addition, of course, there was the arrest of Jason

22   Moe on the same day that Mr. Ogle was taken into custody, and

23   Mr. Moe did identify Sean Ogle as being a co-conspirator with

24   him and had been distributing methamphetamine for several

04:00   25   years.  The information that has been provided to me by these

16

1    various individuals has come from independent sources and seem

2    to cross-corroborate each other, very similar information.  I

3    do not believe any of the defendants have had the ability to

4    review any of the disclosure, so they would not have access to

04:00   5    the documents that I provided, and thus would only be relying

6    on their own experience or recollection.

7    Q.   Detective Anderson, are all of these -- through your

8    investigation, have you been able to determine if some of these

9    people giving information on Mr. Ogle actually even know or

04:00   10   associate with each other?

11   A.   I believe some of these individuals do not know each other

12   and are kind of separated by being involved in kind of a

13   different segment of the conspiracy.

14   Q.   And as far as Mr. Ogle's prior history, he does have some

04:01   15   type of involvement with the court system, is that correct?

16   A.   I'm aware that Mr. Ogle was convicted of a cocaine

17   violation in the District of North Dakota, I believe, in the

18   late eighties or early nineties and also a felon in possession

19   of a firearm in 2002 in the Minneapolis, Minnesota, area.

04:01   20   Q.   Is there some connection between some of these people that

21   have already been indicted and others who may be targeted or

22   have cooperated, like Todd Vice and Jared Nikle and Justin

23   Peterson?  Any of these guys -- Jay Weist, I think you

24   mentioned, Richard Heyen and Mr. Ogle, is there a connection

04:02   25   that extends beyond just the recent few years?

17

1    A.    Yes.   Based on what I've been told by the various people

2    I've debriefed, that Ogle, Heyen, Todd Vice, Jay Weist and

3    other individuals knew each other in Fargo, North Dakota,

4    through the high school, grew up and then developed a

04:02    5    relationship from that early experience on the activity stated,

6    ongoing from that point.

7             MR. SHASKY:   That's all I have, Your Honor.

8             THE COURT:   Mr. Goff.

9             MR. GOFF:   Thank you, Your Honor.

04:03    10                       CROSS-EXAMINATION

11    BY MR. GOFF:

12    Q.    Detective Anderson, according to the affidavit, you got

13    information about Sean Ogle from Richard Heyen?

14    A.    No, not from Richard Heyen.

04:03    15    Q.    Todd Vice?

16    A.    Todd Vice.

17    Q.    Okay.   And Paula Harland?

18    A.    Paula Harland, yes.

19    Q.    And if I understand correctly, Paula Harland got her

04:03    20    information from Jay Weist?

21    A.    Correct.

22    Q.    She didn't -- she didn't -- if I understand correctly, she

23    didn't articulate any specific personal information about Sean

24    Ogle, just what she got from Jay Weist?

04:03    25    A.    Observations of what took place at the Weist residence,

18

1  overhearing conversations or phone calls, information that was

2  related directly to her by Jay Weist.

3  **Q.**   But she did say she overheard some phone conversations?

4  **A.**   I believe there was conversations, whether it was on the

5  phone or person to person.

6  **Q.**   Okay.  And who is Paula Harland?  What's her connection to

7  this investigation?

8  **A.**   She is a person that was spending time at Jay Weist's

9  residence for the purpose of babysitting, and would have done

10  so over the summer of 2008.

11  **Q.**   She was a babysitter?

12  **A.**   Correct.

13  **Q.**   Did she get arrested?

14  **A.**   She is in custody in Cass County jail right now for, I

15  think, bad checks.

16  **Q.**   Okay.  Not related to this investigation?

17  **A.**   No.

18  **Q.**   Jessica Seeley, you said, lived with Jay Weist, I think,

19  over the summer of 2008, is that correct?

20  **A.**   Correct.

21  **Q.**   And was she involved in this investigation?

22  **A.**   She is involved in bad checks.  She was a person that was

23  identified as stealing checks from Jay Weist's residence, along

24  with some other individuals that are involved in a different

25  drug conspiracy.  I believe the checks were then forged, and

04:04

04:04

04:04

04:04

04:05

19

1  that is what is her criminal complaint at this point.

2  **Q.**   Okay.  But not directly involved in this drug conspiracy?

3  **A.**   Other than the fact that she was there and used drugs and

4  would have been involved, but she's not charged in this

5  conspiracy.

6  **Q.**   Okay.  And Todd Vice, is he charged in this conspiracy?

7  **A.**   He is pending.  He's being investigated by the U.S.

8  Government and at some point will be facing charges, either

9  state or federal.

10 **Q.**   Okay.  But he has already given you -- according to the

11 Affidavit, he's given you a statement or given you information

12 about Mr. Ogle in this drug conspiracy.

13 **A.**   That's correct.

14 **Q.**   And including he acknowledged his own involvement to some

15 extent.

16 **A.**   Correct.

17 **Q.**   Now, Michelle Foss, she is a name not included in the

18 Affidavit.  She is somebody that's arisen in the investigation

19 since the Affidavit?

20 **A.**   She was arrested, I believe, a couple days after Richard

21 Heyen and Todd Vice were contacted or arrested at the search

22 warrant.  She was arrested, I believe, like two days

23 afterwards, when she attempted to dispose of methamphetamine

24 that was left over at Mr. Heyen's residence.  She is charged in

25 Cass County, North Dakota, state court.

20

1    **Q.**   She's entered into a cooperation agreement with the

2    Government?

3    **A.**   Yes.

4    **Q.**   Does that -- what does that agreement include as far as

04:07    5    her being criminally prosecuted?

6    **A.**   I have not seen the cooperation agreement, so I couldn't

7    answer that question.

8    **Q.**   Have you been told anything about it?

9    **A.**   I believe that she is to face state charges, but not to be

04:07   10    charged in the federal investigation.

11    **Q.**   Did I understand you to say Richard Heyen has a

12    cooperation agreement?

13    **A.**   No, he has not.

14    **Q.**   That's not right.  Christine Artamenko?

04:07   15    **A.**   Correct.

16    **Q.**   She was a girlfriend of Todd Vice?

17    **A.**   Yes.

18    **Q.**   And you interviewed her as well?

19    **A.**   I spoke to her on one occasion and anticipating further

04:07   20    contact.

21    **Q.**   Has she given you any direct information about Mr. Ogle?

22    **A.**   She has not at this point.

23    **Q.**   Okay.  Did Jessica Seeley give any direct information

24    about Mr. Ogle?

04:08   25    **A.**   Just what she learned by her contact at the Weist

21

1   residence during the summer of 2008.

2   **Q.**   Okay.  Was that somebody other than Jay Weist?

3   **A.**   No, Jay Weist.

4   **Q.**   Now, did you say Justin Peterson --

04:08   5   **A.**   Yes.

6   **Q.**   -- has given a proffer, an interview?

7   **A.**   Yes.

8   **Q.**   And also entered a cooperation agreement?

9   **A.**   Yes.

04:08   10   **Q.**   And he has, I think you said, identified Mr. Ogle and

11   Candice Peterson?

12   **A.**   Correct.

13   **Q.**   And he also indicated that he was present when Jason Moe

14   and Sean Ogle were in Felton, Minnesota?

04:09   15   **A.**   Justin Peterson lived in Felton, and Jason Moe was

16   bringing meth. up to Justin Peterson from The Cities.  And on

17   at least one occasion Sean Ogle was with him when Jason Moe

18   delivered the methamphetamine.  And then Justin Peterson also

19   observed Sean Ogle at Moe's residence in The Cities, and I

04:09   20   believe he also indicated that he saw Sean Ogle at Jared

21   Nikle's residence, who also provided a statement concerning

22   Ogle's involvement in the conspiracy.

23   **Q.**   Jared Nikle did?

24   **A.**   Yes.

04:09   25   **Q.**   Does Jared Nikle have a cooperation agreement?

22

A.   I do not believe he has signed one.  He was initially

working on one and then since has been indicted, and he is

making overtures that he wishes to continue to cooperate.

Q.   Do you know if Justin Peterson's cooperation agreement

04:10   discusses criminal prosecution at all?

A.   You know, I don't know the terms.  I believe that -- well,

he is indicted, and as far as the terms, I do not know.

Q.   Okay.  And Jason Moe was also interviewed by you?

A.   Jason Moe provided a statement at the time he was

04:10   arrested.

Q.   So he's also under a criminal prosecution?

A.   He's indicted, correct.

Q.   Indicted?

A.   Yes.

04:10   Q.   There's reference in here to -- in the Affidavit I'm

referring to of a search warrant at the residence of Jay Weist?

A.   Correct.

Q.   On September 17th?

A.   Yes.

04:11   Q.   Were you present at that time?

A.   Yes, I was.

Q.   And that was a search warrant that revealed some marijuana

and some United States currency?

A.   Yes, that's correct.

04:11   Q.   And that -- according to paragraph 29, it says that was at

23

1    the residence of Jay Weist at 1634 Third Street North in Fargo?

2    A.    Correct.

3    Q.    Back in paragraph 18 it talks about the residence of Jay

4    Weist and it says 1634 Second Street North.  Which one of those

04:11    5    is correct?

6    A.    I believe it's Third, 1634 Third Street North.

7    Q.    So the "Second Street" at paragraph 18 is just a

8    typographical error?

9    A.    Correct.

04:12    10    Q.    And are you aware of any material in the investigation

11    that would indicate that my client has actually possessed any

12    of these controlled substances on his person or in his

13    constructive possession?

14    A.    Mr. Ogle had methamphetamine, LSD, and marijuana on his

04:12    15    possession at the time he was arrested.  He also had traded

16    some LSD to Sean -- or, excuse me, to Jason Moe at the time

17    that -- prior to his arrest that day, along with a seal stamper

18    from the County of Hennepin, I believe, that was traded for

19    some drugs.

04:13    20    Q.    An official seal stamp?

21    A.    Yes.

22    Q.    Hennepin County?

23    A.    I believe so.  It was one of the counties.  It was an

24    official seal, an old-fashioned stamper.

04:13    25    Q.    Okay.  Do you -- are you familiar with the circumstances

24

1  of my client's arrest?

2  **A.**  Basic information.

3  **Q.**  What can you tell us about that?

4  **A.**  That he was observed at the Ogle -- or at the Moe

5  residence, observed going out to his vehicle and then returning

6  to the residence.  There was a female that left and was talked

7  to by law enforcement, and they verified that Sean Ogle and

8  Jason Moe were in the residence.  Sean Ogle then exited Moe's

9  residence and was followed by law enforcement and stopped for a

10  traffic violation, and then was interviewed by them and was

11  subsequently arrested when they observed, I believe, marijuana

12  in plain view in the motor vehicle.

13  **Q.**  Do you know the identity of the female who gave that

14  information?

15  **A.**  Let's see here.  Barbara Gardner.

16  **Q.**  Well, do you know anything about her?

17  **A.**  You know, I do not.

18  **Q.**  And just one more question.  Do you know the traffic

19  violation that was committed before he was stopped?

20  **A.**  I believe that was, the taillights were not functioning

21  properly and no seatbelt.

22  **Q.**  Is this at night?

23  **A.**  I believe it was during the daytime.

24        MR. GOFF:  No further questions, Your Honor.

25

1                           <u>EXAMINATION</u>

2    <u>BY THE COURT</u>:

3    **Q.**    Officer Anderson, paragraph 13 of your Affidavit states

4    that Mr. Vice obtained quantities of methamphetamine from Mr.

5    Ogle.  Do you see that?

6    **A.**    Yes, sir.

7    **Q.**    And how -- did Mr. Vice tell you that or one of your

8    officers working on the case?

9    **A.**    Mr. Vice walked into Mr. Heyen's residence while we were

10   serving the search warrant, and I, along with another officer,

11   interviewed him.  And during that interview he admitted to

12   possessing -- well, he had an ounce of methamphetamine on him,

13   and he identified that ounce as coming from Mr. Ogle and stated

14   that he had also delivered methamphetamine to Richard Heyen,

15   and that that methamphetamine came from Mr. Ogle and that he --

16   **Q.**    When he -- when he said that or told you it came from Mr.

17   Ogle, did Mr. Ogle give it to him?

18   **A.**    Yes, sir, that's what he told me.

19   **Q.**    Likewise, in paragraph 31 of the Affidavit, Mr. Weist

20   suggests, at least according to your Affidavit, that he got a

21   gram or two of methamphetamine from Mr. Ogle, is that correct?

22   **A.**    Yes, sir.

23   **Q.**    Did -- what did he tell you in terms of how he acquired

24   that from Mr. Ogle?  Did Mr. Ogle give it to him?

25   **A.**    Yes.  He said that he hadn't seen him for about a month,

                              26

1   but he admitted that he had acquired methamphetamine from him

2   hand to hand.

3          THE COURT:  Anything further, Mr. Shasky?

4          MR. SHASKY:  No, Your Honor.

5          THE COURT:  Anything else, Mr. Goff?

6          MR. GOFF:  No, Your Honor.

7          THE COURT:  Do you have any other testimony you want

8   to present, Mr. Shasky?

9          MR. SHASKY:  No, Your Honor.  We would rest.

10          THE COURT:  Anything from you, Mr. Goff, other than

11   argument?

12          MR. GOFF:  No, Your Honor.

13          THE COURT:  Well, I don't think it would be

14   appropriate for me at this point to rule on the probable cause

15   until I determine whether or not we should've even taken the

16   testimony, so we'll reserve that until tomorrow.

17          MR. GOFF:  That's fine, Your Honor.

18          THE COURT:  I indicated to Mr. Shasky that anything

19   you wanted to submit to me in writing had to be in by noon

20   tomorrow.  If there's anything that you want to submit,

21   Mr. Goff, in addition to what you've already argued, you may do

22   so, and you can make any other argument you want tomorrow as

23   well.

24          MR. GOFF:  Very well.

25          THE COURT:  If there's nothing further, we'll stand

27

1   in recess then until as soon as we can assemble after you get

2   back from Crookston.  Hopefully it will be about 1:30 tomorrow.

3            MR. GOFF:  It should be by then, Your Honor, yes.  I

4   will just come to the federal courthouse and let them know that

04:18   5   I'm here.

6            THE COURT:  Very good.  Court is adjourned.  Thank

7   you.

8            (Concluded at 4:18 p.m., the same day.)

9                   - - - - - - - - - -

10           (The above-entitled matter came before the Court, The

11   Honorable Charles S. Miller, Jr., United States District Court

12   Magistrate Judge, presiding, commencing at 1:29 p.m.,

13   Wednesday, October 22, 2008, in the United States Courthouse,

14   Bismarck, North Dakota; counsel appearing on behalf of the

15   respective parties as hereinbefore indicated:)

16           (The following proceedings were had and made of

17   record by videoconference from Bismarck to Fargo:)

18           THE COURT:  We'll go on the record in Magistrate's

19   Number 3-08-107, *United States of America versus Sean Anthony*

01:30   20   *Ogle*.  Yesterday we had attempted to conduct a preliminary

21   hearing, and there were issues raised as to whether or not it

22   was out of time, and we took some testimony.  But it now

23   appears that it's much to do about nothing because the Court

24   has subsequently discovered that after the paperwork was

01:30   25   transmitted to this district, the order for detention in

28

Minnesota was entered as of record there.  And that order of

detention reflects the fact that the hearing that took place in

Minnesota actually included the preliminary hearing, and that

the magistrate judge in the District of Minnesota determined

that probable cause existed.  So I think absent somebody being

able to convince me otherwise, this disposes of the matter.

Mr. Goff.

MR. SHASKY:  I agree with that, Judge.

THE COURT:  Pardon me?

MR. SHASKY:  I said I agree with that.

THE COURT:  Okay.  Now, is there anything else?

MR. GOFF:  No, Your Honor.  This appears to be an

appropriate order for detention, which indicates it was

included at the -- or a preliminary hearing, so I have no

reason to disagree with the Court's comments.

THE COURT:  Okay.  Is there anything else that the

defendant wants to raise at this time?

MR. GOFF:  No, Your Honor.

THE COURT:  Okay.  Well, the defendant was ordered

detained by the magistrate judge in the District of Minnesota,

and that detention order is in effect, and consequently he is

detained.  The defendant is detained until the time of trial.

Is there anything further from the United States?

MR. SHASKY:  No, Your Honor.

THE COURT:  Anything further from the Government --

29

1   or, I mean, not from the Government, from --

2          MR. GOFF:  No, Your Honor, just to inquire.  We'll be

3   notified then of further dates and scheduling, things like

4   that?

01:32   5          THE COURT:  Yes.  I don't have those right now in

6   terms of a --

7          MR. GOFF:  That's fine.  That's all I have, Your

8   Honor.

9          THE COURT:  Do we have a trial date?  No, he hasn't

01:32   10  been indicted yet, so there won't be -- Mr. Goff, if the

11  defendant has not been indicted within the next 30 days, you

12  can move for whatever relief might be appropriate.

13         MR. GOFF:  That's fine.  I will do that, Your Honor.

14         THE COURT:  But that would be the next stage in the

01:33   15  process.  Nothing further, court is adjourned.  Thank you.

16         (Concluded at 1:33 p.m., the same day.)

17                    - - - - - - - - - -

18

19

20

21

22

23

24

25

30

1      <u>CERTIFICATE OF COURT REPORTER</u>

2          I, Sandra E. Ehrmantraut, a Certified Realtime

3  Reporter,

4          DO HEREBY CERTIFY that I recorded in shorthand the

5  foregoing proceedings had and made of record at the time and

6  place hereinbefore indicated.

7          I DO HEREBY FURTHER CERTIFY that the foregoing

8  typewritten pages contain an accurate transcript of my

9  shorthand notes then and there taken.

10         Dated this 10th day of January, 2011.

11

12                          <u>/s/ Sandra E. Ehrmantraut</u>
                            Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25